<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SYLVIA CIAPINSKA, <br><br> *Plaintiff,* <br><br> v. <br><br> TINDER, INC., <br><br> *Defendant.* | Civil Action No. 23-23115 <br><br> **OPINION** <br><br> August 30, 2024 |

**SEMPER,** District Judge.

In this matter, Plaintiff Sylvia Ciapinksa ("Plaintiff") filed a putative class action asserting claims against Defendant Tinder, Inc ("Tinder"), now Match Group, LLC ("Match") (ECF 3) under the New Jersey Consumer Fraud Act ("NJCFA") (ECF 1.) Before the Court is Defendant's motion to compel arbitration or in the alternative to transfer the case to the Northern District of Texas (ECF 6, "Motion.") Plaintiff filed a brief in opposition to Defendant's motion. (ECF 10.) Defendant filed a reply in further support of its motion. (ECF 11.) The Court reviewed the Complaint, and the parties' submissions and decided the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1(b).[1] For the following reasons, Defendant's motion to compel arbitration is **GRANTED.**

---

[1] Defendant submitted a memorandum in support of their Motion (ECF 6-6, "Def. Br.") Plaintiff filed opposition to Defendant's Motion. (ECF 10, "Pl. Opp.") Defendant filed a reply in further support of its Motion. (ECF 11, "Def. Reply.")

I.   **FACTUAL AND PROCEDURAL BACKGROUND[2]**

In 2018, Plaintiff signed up and created an account on Match's online dating application "Tinder." (ECF 1, Compl. ¶ 6). In or about 2019, Plaintiff contends she was permanently banned from Tinder without explanation. (*Id*. ¶ 7). Upon inquiry, Plaintiff claims she discovered that her likeness was being used without her knowledge or consent for a fake account. (*Id*. ¶ 12.) After further review, Plaintiff asserts that the individual who created the fake account was able to take public photos from Plaintiff's Instagram account and successfully pass Tinder's verification process. (*Id*. ¶ 17.) Plaintiff argues that Defendant's Photo Verification process does nothing to verify the user's identity—it lacks the capability to detect whether a selfie was actually taken by the user at the time they seek verification. (*Id*. ¶ 18.) Rather, as Plaintiff's experience proved, it simply compares the stolen public photos against other stolen public photos. (*Id*.) To date, Plaintiff claims that unknown individuals continue to use Plaintiff's photos to match with Defendant's users under the false impression that they are Plaintiff. (*Id*. ¶ 31.)

Plaintiff filed suit in the Superior Court of New Jersey, Law Division, Bergen County. Match filed a Notice of Removal, properly removing the litigation to this Court. (ECF 1.) Defendant filed the instant motion seeking to compel arbitration of Plaintiff's claims and to dismiss or stay the present proceedings pending the resolution of any arbitration. (ECF 6.)

II.   **STANDARD OF REVIEW**

When deciding a motion to compel arbitration, a district court should apply one of two standards, depending on the circumstances. *See Guidotti v. Legal Helpers Debt Resol*., LLC, 716 F.3d 776, (3d Cir. 2013). "[W]hen it is apparent, based on the face of a complaint, and documents

---

[2] These facts are drawn from Plaintiff's Complaint (ECF 1, Ex. A., "Compl.") This Court also relies on documents integral to or relied upon by the Complaint. *See In Re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (allowing consideration of exhibits referenced but not explicitly cited in the complaint).

2

relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay." *Guidotti*, 716 F.3d at 773. However, the "Rule 12(b)(6) standard is inappropriate when the complaint does not contain the requisite clarity to establish on its face that the parties agreed to arbitrate, or the opposing party has come forth with reliable evidence that is more than a naked assertion . . . that it did not intend to be bound by the arbitration agreement[.]" *Id*. at 774 (internal quotations and citations omitted). Faced with these circumstances, courts should use the Federal Rule of Civil Procedure 56 ("Rule 56") summary judgment standard.[3] *Guidotti*, 716 F.3d at 774. "Therefore, a court must first determine whether there is a genuine issue of material fact as to whether a valid arbitration agreement exists." *Jayasundera*, 2015 WL 4623508, at *2. In making this determination, the party opposing arbitration receives "the benefit of all reasonable doubts and inferences that may arise." *Id.*

### A. Application of Standard of Review

Here, Plaintiff's Complaint and supporting documents are unclear regarding the agreement to arbitrate as Plaintiff's Complaint does not reference any arbitration agreement. (*See* ECF 1, Compl.) Rather, the Defendant first refers to the arbitration agreement set forth in Tinder's Terms of Use ("TOU") in their memorandum supporting the motion herein. (ECF 6-6, Def. Br. at 3-6.) Accordingly, the Court must go beyond the face of Plaintiff's pleading to address Defendant's argument in favor of compelling arbitration and Plaintiff's opposition regarding same. In doing so, the court uses the Rule 56 standard to "ensur[e] that arbitration is awarded only if there is an express, unequivocal agreement to that effect." *Guidotti*, 716 F.3d at 773 (internal quotation omitted).

---

[3] The Third Circuit explained in *Guidotti* that in a situation of "arbitrability not being apparent on the face of the complaint, "the issue should be judged under the Rule 56 standard." *Giudotti* 716 F.3d at 774.

### III. DISCUSSION

#### A. State Law Application

"State contract principles apply in ascertaining whether the parties to an action have agreed to arbitrate." *Sarbak v. Citigroup Glob. Mkts., Inc.*, 354 F. Supp. 2d 531, 537 (D.N.J. 2004) (first citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995), and then citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002)). "Under New Jersey law,[4] '[a]n agreement to arbitrate, like any other contract, must be the product of mutual assent, as determined under customary principles of contract law.'" *Levy v. AT&T Servs., Inc.*, Civ. A. No. 21-11758, 2022 WL 844440, at *3 (D.N.J. Mar. 22, 2022) (alteration in original) (quoting *James v. Glob. TelLink Corp.*, 852 F.3d 262, 265 (3d Cir. 2017)). "Therefore, 'if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract.'" *Id.*

#### B. Enforceability of Arbitration Agreements Generally

The Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq*. ("FAA"), provides that "[a] written provision . . . to settle by arbitration a controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision reflects "a strong federal policy in favor of resolving disputes through arbitration." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 522 (3d Cir. 2009). Thus, "any doubts concerning the scope of arbitrable issues should be resolved in

---

[4] Defendant does not address which state law should govern contract formation and the interpretation of the online agreement. However, New Jersey law applies here because the purported agreement was allegedly entered into in the state of New Jersey, this case concerns violations of New Jersey law, and Plaintiff is a resident of New Jersey. *See, e.g., Kozur v. F/V Atl. Bounty, LLC*, No. 18-08750, 2020 U.S. Dist. LEXIS 148633, at *16 (D.N.J. Aug. 18, 2020) (applying New Jersey state law to determine the enforceability of an arbitration agreement where "Plaintiff's contract was entered into in New Jersey, between a New Jersey individual and New Jersey companies"). In addition, there is no conflict between New Jersey and Texas law on the formation of a contract. *See Davis v. Dell, Inc.*, No. 07-630, 2008 WL 3843837, at *5, n.2 (D.N.J. Aug. 15, 2008); *see also Beture v. Samsung Electronics America, Inc.*, No. 17-5757, 2018 WL 4621586, at *3 (D.N.J. July 18, 2018) ("find[ing] that there is no conflict between applying New Jersey, [and] Texas . . . substantive law to contract formation, and therefore the laws of New Jersey determine whether the . . . arbitration provision is enforceable.")

4

favor of arbitration, whether the problem at hand is the construction of the contract language itself or any allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also MacDonald v. CashCall, Inc*, No. 16-2781, 2017 WL 1536427, at *5 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018).

Faced with a motion to compel arbitration, a court must perform "a two-step inquiry into (1) whether a valid agreement to arbitrate exists and (2) whether the particular dispute falls within the scope of that agreement." *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005). As discussed *supra,* the agreement to arbitrate here is not discernable from the face of Plaintiff's complaint, and the Court assesses this "renewed motion to compel arbitration . . . under a summary judgment standard." *Guidotti*, 716 F.3d at 776. "In examining whether certain claims fall within the ambit of an arbitration clause, a court must 'focus . . . on the "factual allegations in the complaint rather than the legal causes of action asserted."'" *Jayasundera v. Macy's Logistics & Operations, Dep't of Human Res.*, No. 14-07455, 2015 WL 4623508, at *2 (D.N.J. Aug. 3, 2015) (alteration in original) (quoting *Mut. Benefit Life Ins. Co. v. Zimmerman*, 783 F. Supp. 853, 869 (D.N.J. 1992), *aff'd*, 970 F.2d 899 (3d Cir. 1992)). Generally, if the court determines that the claims in dispute fall within the scope of the arbitration agreement, the court "must then refer the dispute to arbitration without considering the merits of the case." *Id.*

C. **Tinder Terms of Use Arbitration Agreement**

Section 1 of the TOU begins with an overview of the agreement and a specific request to review the agreement's dispute resolution terms:

> By creating a Tinder account or by using any Tinder service, whether through a mobile device, mobile application or computer (collectively, the "Service") you agree to be bound by (i) these Terms of Use, (ii) our Privacy Policy and Safety Tips, each of which is incorporated by reference into this Agreement, and (iii) any terms disclosed to you if you purchase or have purchased additional features, products or services we offer on the Service (collectively, this "Agreement"). If you do not accept and agree to be bound by all

> of the terms of this Agreement (other than the limited one-time opt out right for certain users provided for in Section 15), you should not use the Service.

(ECF 6-6, Def. Br. at 5; ECF 6-3, Ex. B. ¶ 1.) With respect to mandatory arbitration, the TOU contains a broad agreement to arbitrate any disputes, which provides in pertinent part:

> The exclusive means of resolving any dispute or claim arising out of or relating to this Agreement (including any alleged breach thereof), or the Service, regardless of the date of accrual and including past, pending, and future claims, shall be BINDING ARBITRATION administered by the American Arbitration Association under the Consumer Arbitration Rules. The one exception to the exclusivity of arbitration is that you have the right to bring an individual claim against Tinder in a small claims court of competent jurisdiction in the county in which you reside, or in Dallas County, Texas. Such arbitration shall be conducted by written submissions only, unless either you or Tinder elect to invoke the right to an oral hearing before the Arbitrator. But whether you choose arbitration or small claims court, you agree that you will not under any circumstances commence, maintain, or participate in any class action, class arbitration, or other representative action or proceeding against Tinder.

(ECF 6-3, Ex. B. ¶ 15.1.) (emphasis in original).

> By accepting this Agreement, you agree to the Arbitration Agreement in this Section 15 (subject to the limited one-time right to opt out within thirty (30) days belonging to users who first created an account or used the Service prior to May 9, 2018 (such users, "Legacy Users"), discussed below). In doing so, BOTH YOU AND TINDER GIVE UP THE RIGHT TO GO TO COURT to assert or defend any claims between you and Tinder (except for matters that may be properly taken to a small claims court and are within such court's jurisdiction). YOU ALSO GIVE UP YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION OR OTHER CLASS PROCEEDING, including, without limitation, any past, pending or future class actions, including those existing as of the date of this Agreement . . .
>
> . . . If you assert a claim against Tinder outside of small claims court, your rights will be determined by a NEUTRAL ARBITRATOR, NOT A JUDGE OR JURY. . .

(*Id.* ¶¶ 15.2, 15.3.)

### D. Validity of Arbitration Agreement

The threshold questions the Court now faces are (1) whether a valid agreement to arbitrate exists and (2) whether the particular dispute falls within the scope of that agreement." *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005). Therefore, the Court must consider

first if a valid agreement to arbitrate exists by virtue of Plaintiff's creation and use of the Tinder platform and purchased a Tinder Plus subscription.

      Defendant contends that Plaintiff created two Tinder accounts in October 2019 using an Apple iOS device, one on October 13 (which she deleted the next day) and the other on October 15. (ECF 6-6, Def. Br. at 3; ECF 6-1, Declaration of Jennifer Flashman "Flashman Decl." ¶ 5.) Before Plaintiff could use Tinder, she was required to log in by tapping on a "Log In" button or "Create a New Account" link that appeared just below a disclosure stating, "By creating an account or logging in, you agree to our Terms," with the word "Terms" underlined to show it was a hyperlink to the Tinder TOU. (ECF 6-1, Flashman Decl. ¶¶ 5-6; ECF 6-2, Ex. A; ECF 6-3, Ex. B.) Defendant asserts that Plaintiff could not have created or accessed accounts, or used the Tinder service, without clicking on the "Log In" button or the "Create a New Account" link. (ECF 6-6, Def. Br. at 3-4.) Thus, Defendant argues that Plaintiff assented to the Tinder TOU in effect at that time when she created her accounts and proceeded to "Log In." (*Id*. at 4.) Additionally, Defendant states that after creating her October 13 account, Plaintiff then agreed to the Tinder TOU a second time on the same day when she purchased a subscription to Tinder Plus. (*Id*. at 5.) As part of the subscription process, Plaintiff was presented with a Tinder Plus purchase page (ECF 6-4, Ex. C), which required her to press a "Continue" button that appeared just above a disclosure stating, "By tapping Continue, you agree to our Privacy Policy and Terms" in order to purchase the subscription. (ECF 6-6, Def. Br. at 4-5.) The word "Terms" in this disclosure was bolded to show it was a hyperlink to Tinder's complete TOU. (*Id*. at 5.) As a result, Defendant argues that Plaintiff agreed to the TOU multiple times. (*Id*.)

      Plaintiff does not dispute that Plaintiff could not have created the Tinder accounts in question, or used Tinder's services, without first seeing a page that says "[b]y creating an account

7

or logging in, you agree to our Terms and Privacy Policy." (ECF 11, Def. Opp at 2.) Further, Plaintiff does not dispute that the "Log In" button or the "Create a New Account" link, which users must click on to progress, appeared on an uncluttered screen, directly underneath the disclosure about the Tinder TOU. (*Id*.) Instead, Plaintiff claims Tinder's design and content of its website rendered its TOU "inconspicuous," thus rendering its "sign-wrap" agreement deficient. (ECF 10, Pl. Opp. at 17.) In short, the crux of Plaintiff's argument is that the arbitration provision in question is not enforceable because Plaintiff did not have reasonable notice of its existence. (ECF 10, Pl. Opp. at 18-20.)

The Court disagrees. Plaintiff had sufficient opportunity to review Tinder's TOU when she created multiple accounts and used the Tinder service. Further, the format and layout of Tinder's application and webpage (discussed *supra*) provided the Plaintiff with reasonable notice of the TOU before signing up for a Tinder account, as well as before placing an order for the Tinder Plus subscription. (*See* ECF 6, Exs. A, C-D.) Indeed, Plaintiff's distinctions between the terminology as it relates to browsewraps, clickwraps, scrollwraps, and sign-in wraps are not the pre-eminent inquiry. Instead, "[a]t bottom, regardless of [terminology], the pertinent inquiry is whether the user was provided with reasonable notice of the applicable terms, based on the design and layout of the website." *Mucciariello v. Viator, Inc.*, No. 18 Civ. 14444, 2019 WL 4727896, at *3 (D.N.J. Sept. 27, 2019) (finding that "hyperlinked terms . . . amount to an enforceable agreement when 'reasonable notice' is provided and a button is designated to manifest assent, near a statement informing the user that, by clicking, he or she is agreeing to be bound by the hyperlinked terms.") Here, Plaintiff created numerous accounts and even purchased a subscription indicating her sufficient opportunity to consult and assent to the TOU before continuing to use the platform. *See D'Ambola v. Daily Harvest, Inc.*, No. 22-6316, 2023 WL 3720888, at *4 (D.N.J. May 30, 2023.)

That Plaintiff may have failed to read or review the conspicuously referenced TOU, which Match made accessible to her via hyperlink, is not a reason to find the arbitration clause unenforceable. *See Home Source Industries, LLC v. Freightquote.com, Inc.,* No. 14-2001, 2014 WL 6609051 at *5 (D.N.J. Nov. 19, 2014) ("A failure to read the terms and conditions . . .1 does not render the forum selection clause invalid or diminish its force and effect."); *Toll Brothers, Inc. v. Fields*, No. 10-04606, 2011 WL 463090 at *3 (D.N.J. Feb. 4, 2011) ("[F]ailure to 'read a contract does not excuse performance unless fraud or misconduct by the other party prevented one from reading.'") (citation omitted).

Ultimately, the Court finds that Plaintiff agreed to Tinder's TOU and arbitration clause by tapping the "Log In" button and/or "Create a New Account" link and the TOU included a valid arbitration agreement.

### E. Scope of the Agreement

In light of the Court's determination that the arbitration provision within the TOU is valid, the Court next turns to the issue of arbitrability, *i.e.*, whether the dispute falls within the scope of the Arbitration Agreement. *See, e.g.*, *Beture v. Samsung Elecs. Am., Inc.*, No. 17-5757, 2018 WL 4621586, at *3 (D.N.J. My 18, 2018). Critically, "[P]arties can agree to arbitrate gateway questions of arbitrability, such as whether their agreement covers a particular controversy." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010) (internal quotations omitted). "When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 586 U.S. 63, 65 (2019). Indeed, the Court may not decide the issue of arbitrability if a valid arbitration agreement delegates such issue to an arbitrator. *Id.* at 69-70.

9

Here, the TOU states that a user must arbitrate "any dispute or claim arising out of or relating to this Agreement (including any alleged breach thereof), or the Service, regardless of the date of accrual and including past, pending, and future claims." (ECF 6, Ex. B. ¶ 15.1.) Specifically, subsection 15.3 of the TOU provides that, "the arbitrator shall determine all claims and all issues regarding the arbitrability of the dispute."[5] The Court, therefore, finds the arbitration provision valid and the scope of that provision an issue for the arbitrator to review. Accordingly, Defendant's Motion to Compel Arbitration is **GRANTED**.

### IV.   CONCLUSION

For the reasons stated above, Defendant's motion to compel arbitration is **GRANTED**. This Court will stay the current action pending arbitration. *See Smith v. Lindemann*, No. 10-33119, 2014 U.S. Dist. LEXIS 27605, at *35 (N.D. Cal. Feb. 20, 2014) (staying judicial proceedings and compelling arbitration on plaintiff's claims); *Seus v. John Nuveen & Co.*, 146 F.3d 175, 179 (3d Cir. 1998)[6] ("If a party to a binding arbitration agreement is sued in a federal court on a claim that the plaintiff has agreed to arbitrate, it is entitled under the FAA to a stay of the court proceeding pending arbitration and to an order compelling arbitration" (citing 9 U.S.C. §§ 3,4)). An appropriate Order follows.

/s/ Jamel K. Semper
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:   Clerk
cc:     Leda D. Wettre, U.S.M.J.
        Parties

---

[5] The Court finds that the TOU's express delegation to the arbitrator is clear on its own. However, in addition, the TOU states that the arbitration shall be administered by "American Arbitration Association under the Consumer Arbitration Rules." (ECF 6, Flashman Decl., Ex. B ¶ 15.1.) AAA Consumer Rule 14(a) states that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." *See* Consumer Arbitration Rules, American Arbitration Association (Sept. 1, 2014), https://adr.org/sites/default/files/Consumer-Rules-Web_0.pdf.

[6] Overruled on other grounds by *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, (2000).